UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov


In re:                                                    Case No: 11-29148-EPK

MAHAMMAD A. QURESHI                                       Chapter 11

    Debtor.
_____/

**OBJECTION OF TM DEBT ACQUISITION, LLC TO**
**ADEQUACY OF DEBTOR'S AMENDED DISCLOSURE STATEMENT**
**[Related DE 212]**

TM Debt Acquisition, LLC ("TM Debt"), assignee of a portion of the claim of First Southern Bank, by and through its undersigned counsel, hereby objects to the adequacy of Debtor's Amended Disclosure Statement [DE 212] (the "*Amended Disclosure Statement*") filed herein by Mahammad A. Qureshi, debtor and debtor in possession (the "Debtor"), on February 21, 2013.  In support thereof, TM Debt represents as follows:

**BACKGROUND**

1.      The Debtor commenced this chapter 11 proceeding on July 10, 2011 (the "Petition Date") by filing a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

2.      The Debtor is operating as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.      On or about February 17, 2012, First Southern Bank assigned a portion of its claim to TM Debt, as evidenced by the Notice of Transfer of Claim Other Than for Security [DE 150] (the "*Transfer of Claim*") filed with the Court on February 20, 2012.  As evidenced by the *Transfer of Claim*, TM Debt acquired the portion of First Southern Bank's claim against the

{00030830-4}

Debtor related to the Debtor's personal guarantee of a loan from First Southern Bank to Flovest, LLC. This claim is in the amount of $1,875,659.30. [*See*, DE 150; Claim No. 19].

4.      On February 21, 2013, the Debtor filed his *Amended Disclosure Statement* in support of the Debtor's Plan of Reorganization [DE 213] (the "*Plan of Reorganization*"). A hearing on the adequacy of the *Amended Disclosure Statement* is scheduled before this Court for April 11, 2013 at 1:30 p.m. [*See*, DE 217].

## LAW AND ARGUMENT

5.      The *Amended Disclosure Statement* should not be approved because it fails to contain "adequate information" as required by the Bankruptcy Code. Section 1125(b) of the Bankruptcy Code provides that "[a]n acceptance or rejection of a plan may not be solicited…unless, at the time or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and *a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information*." *11 U.S.C. § 1125(b)* (emphasis added). The Bankruptcy Code defines "adequate information" as,

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such hypothetical investor of the relevant case to make an informed judgment about the plan…

*11 U.S.C. §1125(a)(1).*

6.      The Bankruptcy Code does not offer any further assistance as to what constitutes "adequate information." Nevertheless, many Courts have adopted extensive lists of the type of information often needed to be included in a disclosure statements, such as the following:

a.      The circumstances that gave rise to the filing of the bankruptcy petition;

b.      A complete description of the available assets and their value;

c.      The anticipated future of the debtor;

d.      The source of information provided in the disclosure statement;

e.      A disclaimer, which typically indicates that no statements or information concerning the debtor or its assets or securities are authorized, other than those set forth in the disclosure statement;

f.      The condition and performance of the debtor while in Chapter 11;

g.      Information regarding claims against the estate;

h.      A liquidation analysis setting forth the estimated return that creditors would receive under Chapter 7;

i.      The accounting and valuation methods used to produce the financial information in the disclosure statement;

j.      Information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;

k.      A summary of the plan of reorganization;

l.      An estimate of all administrative expenses, including attorneys' fees and accountants' fees;

m.      The collectability of any account receivable;

n.      Any financial information, valuations, or *pro forma* projections that would be  relevant to creditors' determinations of whether to accept or reject the plan;

o.      Information relevant to the risks being taken by the creditors and interest holders;

p.      The actual or projected value that can be obtained from avoidable transfers;

q.      The existence, likelihood and possible success of non-bankruptcy litigation;

r.      The tax consequences of the plan; and

s.      The relationship of the debtor with affiliates.

See e.g., *In re Scioto Valley Mortg. Co.,* 88 B.R. 168 (Bankr. S.D. Ohio 1988); *In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984); *In re Ferretti,* 128 B.R. 16 (Bankr. D. N.H. 1991).

7.      Based upon the foregoing considerations, the *Amended Disclosure Statement* filed by the Debtor woefully lacks the necessary information to enable a hypothetical reasonable investor to make an informed decision to accept or reject the *Plan of Reorganization*.

8.      The *Amended Disclosure Statement* is seriously deficient in numerous regards, including, but not limited to the following:

a.      The Debtor, in his prior Disclosure Statement filed with the Court on or about September 21, 2012, failed to include a liquidation analysis, a defect that has not been adequately addressed in the *Amended Disclosure Statement*. While the Debtor has attached a document identified as a liquidation analysis for entities in which Debtor holds an interest, as the Court will see, that analysis is not sufficient to comply with the disclosure requirements necessary to meet the requirement for adequate information as set forth in 11 USC §1125(B).

i.      It should be noted that the liquidation analysis demonstrates that the Debtor is the 100% owner of a number of limited liability companies listed therein. The Debtor-in-Possession standing in the shoes of a trustee has the ability to liquidate the assets and/or entities in which the Debtor is a 100% member. Pursuant to the decision of the Florida Supreme Court in *Olmstead vs. FTC,* 44 So. 3d 76 (Fla. 2010), when dealing with a single member LLC, there is no one to obtain consent from for the sole member in the single member LLC from taking on a new member which member would have the full right, title and interest of

the transferor without the consent of anyone other than the transferor.  Consequently, an analysis must be made of the Debtor's membership interests in the liquidation analysis. Furthermore, in those LLC's where the members are liquidating the LLC's, the interests that would otherwise be available for distribution to the Debtor should be included in the liquidation analysis.

        ii.    A review of the liquidation analysis shows that Super Stop Petroleum, Inc. is an entity owned 100% by the Debtor with properties owned by the entity having a market value of $19,750,000.00.  The *Amended Disclosure Statement* lists debt on that real estate of $11,453,094.00 but further indicates that there is zero dollars available in the liquidation value. A cursory review of the liquidation analysis would cause one to conclude that there are substantial funds that would be available to the Debtor in the liquidation of the assets of that entity.  Furthermore, GMAQ has assets to be liquidated and ultimately distributed for the benefit of the creditors and should be included in the liquidation analysis. For instance, TM is aware that GMAQ, LLC ("GMAQ"), which the Debtor is a 50% member, has a substantial free and clear asset, and is in its own liquidation, which if fully pursued, should result in the recovery of hundreds of thousands of dollars to the Debtor's estate.  However, creditors are not provided any information, let alone meaningful information, regarding the assets of GMAQ available to the Debtor's creditors in a liquidation.  Similarly, there is inadequate information about the other thirty or more companies and the value of such interests to determine if they are best served under the *Plan of Reorganization* or under a chapter 7 liquidation.  Due to the absence of a meaningful liquidation analysis and a sufficient description of the Debtor's assets, creditors are unable to determine any estimated return they would receive if the Debtor's non-exempt assets were liquidated pursuant to a Chapter 7 proceeding.

      b.     Relatedly, the *Amended Disclosure Statement* (as the one before it) fails to describe the Debtor's pursuit of any Chapter 5 causes of action, and any potential recovery as a result thereof. The *Amended Disclosure Statement* simply states that "[t]he Debtor does not intend to pursue preference, fraudulent conveyance or other avoidance actions." *Amended Disclosure Statement*, Section II, A. Whether or not the Debtor intends or chooses not to pursue any such claims is clear; however, disclosure of the existence, nature and amount of such claims is, at a minimum, required so creditors may make an informed decision that the *Plan of Reorganization* with no attribution of chapter 5 recoveries better serves creditor's interests than an independent chapter 7 fiduciary pursuing such claims on their behalf. TM Debt is aware of at least one potential chapter 5 cause of action that could result in a recovery for the benefit of the Debtor's unsecured creditors amounting to hundreds of thousands of dollars – far more than the projected 5-year pay-out under the *Plan of Reorganization*. More specifically, within the relevant reach-back period for fraudulent transfer actions, the Debtor, either individually or through entities he controlled, facilitated the unauthorized assignment of a multi-million dollar note and mortgage held by GMAQ on certain property owned in Pennsylvania by Evergreen Elder Care, Inc. (the "*Evergreen Mortgage*"). This assignment was made to an entity managed by the Debtor and owned by the Debtor's sister, BNK Real Estate, LLC ("BNK"), for no consideration and is the subject of both state court litigation in Berks County, Pennsylvania, as well as litigation in the United States Bankruptcy Court for the Southern District of Ohio.[1] The Debtor's apparent lack of initiative in pursuing this, or other avoidance actions, raises concerns

---

[1] Specifically, in March, 2010, GMAQ purported to assign the *Evergreen Mortgage* to Defendant BNK Real Estate, LLC – a company controlled by the Debtor. [*See*, Exh. 1 (certified copy of recorded assignment).] In his deposition, the Debtor admitted that nothing was paid to GMAQ in return for this transfer, and that the recipient, BNK, was an entity owned by the Debtor's sister, for which he served as manager. [*See*, Exh. 2, Excerpts of Transcript of Deposition of Mahammad Qureshi, at 82-84, 89-90.]

as to whether the Debtor, as a debtor in possession and fiduciary of this estate, is conducting himself in accordance with these fiduciary duties.

       c.    Other than a cursory mention in Section II of the *Amended Disclosure Statement*, the *Amended Disclosure Statement* fails to discuss affiliates of the Debtor, particularly those affiliates which are also chapter 11 debtors in the pending Chapter 11 cases of MAQ Management, Super Stop Petroleum, Inc., Super Stop Petroleum I, Inc., and Super Stop Petroleum IV, Inc., being jointly administered under Case No. 11-26571-BKC-EPK in this Court (the "MAQ Case"). The potential impact of the MAQ Case is significant considering that the Debtor is the 100% shareholder of each chapter 11 debtor. Yet, the Debtor makes no mention of the MAQ Case in his *Amended Disclosure Statement*, or the potential impact thereof.

       d.    The *Amended Disclosure Statement* fails to provide a complete discussion of the claims made against the estate. Section III, C of the *Amended Disclosure Statement* briefly discusses the proposed treatment of Class 5 and Class 6 claims, yet makes no mention of the proposed treatment of the remaining four classes.

    9.    The foregoing recitation of defects in the *Amended Disclosure Statement* is not intended to be exhaustive or conclusive. From these examples, however, it is clear that the *Amended Disclosure Statement* cannot be approved under even the most generous interpretation of the term "adequate information" under section 1125 of the Bankruptcy Code.

    WHEREFORE, TM Debt Acquisition, LLC, respectfully requests that this Court deny the approval of the *Amended Disclosure Statement* and grant such other and further relief as the Court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF electronic transmission on all parties listed on the attached Service List on April 4, 2013.

Respectfully submitted,

RICE PUGATCH ROBINSON & SCHILLER, P.A.
*Attorneys for TM Debt Acquisition, LLC*
101 N.E. Third Avenue, Suite 1800
Ft. Lauderdale, FL 33301
Tel:     (954) 462-8000
Telefax: (954) 462-4300
Email:  rstorfer@rprslaw.com

By:___ /s/ Richard B. Storfer_____
    Richard B. Storfer, Esq.
    Florida Bar No. 984523

## SERVICE LIST

**VIA CM/ECF:**

| | | |
|---|---|---|
| • | Adam D. Marshall | amarshall@marshallgrant.com |
| • | Joe M. Grant | jgrant@marshallgrant.com |
| • | Office of the US Trustee | USTPRegion21.MM.ECF@usdoj.gov |
| • | Bruce E. Bloch, Esq. | general@sblawfirmfl.com |
| • | Brian P. Yates, Esq. | byates@sblawfirmfl.com |
| • | Robert P. Charbonneau, Esq. | rpc@ecccounsel.com |
| • | Bertis A. Echols, Esq. | bechols@evanspetree.com |
| • | Manuel Farach, Esq. | mfarach@richmangreer.com |
| • | Nicole M. Grimal, Esq. | ng@ecclegal.com |
| • | Mychal J. Katz, Esq. | mkatz@ralaw.com |
| • | Glenn Jensen, Esq. | gjensen@ralaw.com |
| • | Andrew V. Layden, Esq. | alayden@bakerlaw.com |
| • | Joe M. Lozano, Esq. | notice@bvwlaw.com |
| • | Nicole M. Mariani, Esq. | bankruptcynotices@kasslaw.com |
| • | Kathleen S. McLeroy, Esq. | kmcleroy@carltonfields.com |
| • | Kevin A. Reck, Esq. | kreck@foley.com |
| • | Luis Salazar, Esq. | luis.salazar@izhmlaw.com |
| • | Richard B. Storfer, Esq. | rstorfer@rprslaw.com |
| • | Marta Suarz-Murias, Esq. | msuarez-murias@blesmlaw.com |
| • | Mark J. Wolfson, Esq. | mwolfson@foley.com |

# EXHIBIT "1"

 

**INSTRUMENT # 2010010077**

RECORDED DATE: 03/22/2010 02:04:13 PM

3496553-0005X

Frederick C. Sheeler
Berks County Recorder of Deeds

Berks County Services Center 3rd Floor
633 Court Street
Reading, PA 19601
Office: (610) 478-3380 ~ Fax: (610) 478-3359
Website: www.countyofberks.com/recorder

| | |
|---|---|
| Document Type:   ASSIGNMENT OF MORTGAGE | Transaction #:   3555937<br>Document Page Count:   3<br>Operator Id:   lpierce |
| RETURN TO: (Mail)<br>THE NEWMARK LAW FIRM<br>2650 W STATE RD 84<br>SUITE 101-C<br>FORT LAUDERDALE  FL<br>33312 | SUBMITTED BY:<br>THE NEWMARK LAW FIRM<br>2650 W STATE RD 84<br><br>SUITE 101-C<br>FORT LAUDERDALE, FL 33312 |

* PROPERTY DATA:

** PLEASE SEE DOCUMENT OR INDEX FOR PROPERTY DATA

* ASSOCIATED DOCUMENT(S): REC BK 5339 PG 1673

| FEES / TAXES: | |
|---|---|
| RECORDING FEES: ASSIGNMENT OF MORTGAGE | $26.00 |
| RECORDS IMPROVEMENT FUND | $5.00 |
| JUDICIAL FEE | $23.50 |
| WRIT TAX | $0.50 |
| **Total:** | **$55.00** |

INSTRUMENT #: 2010010077
Recorded Date: 03/22/2010 02:04:13 PM

I hereby CERTIFY that this document is recorded in the Recorder of Deeds Office in Berks County, Pennsylvania.

Frederick C. Sheeler
Recorder of Deeds

## OFFICIAL RECORDING COVER PAGE

Page 1 of 4

# PLEASE DO NOT DETACH
## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

NOTE: If document data differs from cover sheet, document data always supersedes.
*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION.

**EXHIBIT**

**1**

Certification signature by Berks County Recorder of Deeds
<berkscertify@recordxusion.com> Validity: Unknown



UNITED STATES
POSTAL SERVICE.    Receipt
Electronic Postmark    ID10090kaj81t
Validation may require Adobe Windows Integration

eCertified copy of recorded # 2010010077 (page 1 of 4)
Berks County Recorder of Deeds
Only valid with apm-signature on cover page

GB 004129

Prepared by and record and return to:
Tracy Belinda Newmark, Esquire
The Newmark Law Firm, P.A
2650 West State Road 84
Suite 101-C
Fort Lauderdale, Florida 33312
(954) 926-2460

## ASSIGNMENT OF MORTGAGE

On this __16__ day of March, 2010, the part of the first party, GMAQ, LLC, in consideration of good and valuable consideration, received from or on behalf of BNK Real Estate, LLC, party of the second part, at or before the execution of this assignment, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, transfer, assign, quit claim and set over all of its right, title and interest to the party of the second part all of its right, title and interest in the following mortgages:

> That certain mortgage and security agreement executed between EVERGREEN ELDER CARE, INC., a Pennsylvania Corporation and GMAQ, LLC, a Florida limited liability company, as recorded in the public records of Berks County, Pennsylvania at Book 05339 at Page 1673 on April 16, 2008.

in the original amount of Two Million Three Hundred Thousand dollars ($2,300,000.00) upon the following land parcel, situate and being in said county of Berks, and the state of Pennsylvania, to wit:

> That certain parcel of land and improvements therein situate in the City of Reading, County of Berks, and Commonwealth of Pennsylvania, and designated as Parcel No. 18-5306-45-06-5111 and more fully described in a Deed dated May 1, 2000, and recording May 8, 2000 in Berks County in Deed Book Volume 3197, Page 1044, granted and conveyed unto Evergreen Elder Care, Inc., a Pennsylvania Corporation.

Together with the note or obligation described in said mortgage and the monies due and to become due thereon, with interest from the date of the execution of the mortgage forward.

TO HAVE AND TO HOLD the same unto the said party of the second part, its successors, heirs and assigns forever.

Signed and sealed in the presence of:

_____
Witness #1

_A L I   S I D D I Q U I_
Printed name of Witness #1

_____
Witness #2

_Tracey B Newmark_
Printed name of Witness #2

_____
GMAQ, LLC, by Mahammad Qureshi,
MANAGING MEMBER

eCertified copy of recorded # 2010010077 (page 2 of 4)
Berks County Recorder of Deeds
Only valid with aon-signature on cover page

GB 004130

STATE OF FLORIDA    )

COUNTY OF PALM BEACH    )

      The foregoing instrument was acknowledged before me this 1͡7 day of March, 2010, by Mahammad Qureshi, as Managing member of GMAQ, LLC ct who is personally known to me or ⁻ who has produced _____ as identification.

                    _Michelle_ (signature)
                    Notary Public

Print Name: Michelle Javed

My Commission expires:

MICHELLE JAVED
MY COMMISSION #DD910901
EXPIRES: MAR 27, 2010
Bonded through 1st State Insurance

eCertified copy of recorded # 2010010077 (page 3 of 4)
Berks County Recorder of Deeds
Only valid with epm-signature on cover page

GB 004131

EXHIBIT "A"
LEGAL DESCRIPTION

All that certain parcel of land and improvements therein situate in the City of Reading, County of Berks, and Commonwealth of Pennsylvania, and designated as Parcel No. 18-5306-45-06-5111 and more fully described in a Deed dated May 1, 2000, and recorded May 8, 2000 in Berks County in Deed Book Volume 3197, Page 1044, granted and conveyed unto Evergreen Elder Care, Inc., a Pennsylvania Corporation.

____ initials

REC BK05339-PG1692
2008019064    04/16/2008 09:47:21 AM 1
BERKS COUNTY ROD

MORTGAGE

eCertified copy of recorded # 2010010077 (page 4 of 4)
Berks County Recorder of Deeds
Only valid with open signature on cover page

GB 004132

# EXHIBIT "2"

**Page 1**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
CASE NO. 2:10-bk-58583

In the Matter of
GEORGE BAVELIS,
    Debtor.

_____

GEORGE BAVELIS,
    Plaintiff,
vs.    Adv. Proc. No. 2:10-ap-02508
TED DOUKAS, Et AL.,
    Defendants.
          /

DEPOSITION OF:  MAHAMMAD QURESHI
    DATE:    December 10, 2010
    TIME:    9:00 a.m.
    PLACE:    4800 North Federal
         Suite 200
         Boca Raton, FL

REPORTED BY:  CANDICE ARENS WATSON, RPR, CSR
    Verbatim Court Reporters, Inc.

**Page 2**

1  APPEARANCES:
2    ZEIGER, TIGGES, LITTLE, LLP
      3500 Huntington Center
3    41 South High Street
      Columbus, OH 43215
4    MR. MARION LITTLE,
      appeared on behalf of the Plaintiff
5
    STEVEN NEWBURGH, P.A.
6    777 South Flagler Drive, Suite 800
      West Palm Beach, FL 33401
7    MR. STEVEN NEWBURGH,
      appeared on behalf of the Defendant
8      Ted Doukas
9
    THE NEWMARK LAW FIRM, P.A.
10    2650 West State Road 84, 101C
      Fort Lauderdale, FL 33312
11    MS. TRACY NEWMARK,
      appeared on behalf of the Defendant
12      Mahammad Qureshi
13  ALSO PRESENT
      MR. GEORGE BAVELIS
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1              WITNESS INDEX
    WITNESS          EXAMINATION
2  MAHAMMAD QURESHI
    By Mr. Little        4
3
4
          E X H I B I T S
5  NUMBER         MARKED FOR ID
    Plaintiff's Exhibit No. 42    38
6      GMAQ Transfer Agreement
    Plaintiff's Exhibit No. 43    38
7      BMAQ Transfer Agreement
    Plaintiff's Exhibit No. 44    38
8      George Real Estate Transfer Agreement
    Plaintiff's Exhibit No. 45    38
9      Flovest Transfer Agreement
10
11    CERTIFIED PORTIONS
        Page    Line
12      52    8
      100    8
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1  WHEREUPON:
2        MAHAMMAD QURESHI,
3  was called as a witness and after having been duly
4  sworn was examined and testified as follows:
5        DIRECT EXAMINATION
6        (Time Noted: 9:44 a.m.)
7  BY MR. LITTLE:
8    Q.  Good morning.  Would you please state
9  your name for the record?
10    A.  Mahammad Qureshi.
11    Q.  And, Mr. Qureshi, what is your
12  personal address?
13    A.  21579 Cartagena Drive, Boca Raton,
14  Florida.
15    Q.  Mr. Qureshi, what's your business
16  address?
17    A.  4800 North Federal Highway.
18    Q.  Have you had your deposition taken
19  before?
20    A.  Yes.
21    Q.  Okay.  On how many different
22  occasions?
23    A.  Many of them.
24    Q.  Okay.  I will just briefly review the
25  rules again just, so there's no confusion.  During

1 (Pages 1 to 4)

**EXHIBIT
2**

Page 81

1    mortgage payments?
2        A.    No, they were behind. It was behind
3    from way back before. The loan got mature. And
4    there was a lawsuit against that, you know.
5        Q.    When was it that the loan matured?
6        A.    I believe the document, George had it,
7    George Bevalis, and the attorney will not give it
8    to me, the copy.
9        Q.    But you are saying there was a lawsuit
10   filed?
11       A.    Yes.
12       Q.    And did you have an understanding in
13   March of 2010 of what the amount of the
14   indebtedness was that was owed by Evergreen Elder
15   Care to GMAQ?
16       A.    No, because the only thing we had was
17   the mortgage was 2 point 3. And that's what we
18   had, the information. The rest of them, George
19   Bavelis had it. And he was going to foreclose.
20       Q.    Who did you talk to at Evergreen Elder
21   Care about the assignment made in Exhibit 49?
22           MRS. NEWMARK: Object to form.
23   BY THE WITNESS:
24       A.    Who do we talk to?
25   BY MR. LITTLE:

Page 82

1        Q.    Yes.
2        A.    Nobody we talk to.
3        Q.    Did you ever have any discussions with
4    anybody at Evergreen Elder Care about the
5    assignment of the mortgage reflected in Exhibit 49?
6        A.    No. We told them assignment of
7    foreclosure, and we sent them notice -- not sent
8    them, but called them up and say you need to start
9    making payment. We assigned the mortgage to the
10   BNK and that's it.
11       Q.    Okay. Now, what is BNK?
12       A.    BNK is my sister's family, they own
13   the company, BNK Real Estate Company.
14       Q.    When you say sister's company, are you
15   talking about biological sister?
16       A.    Biological sister.
17       Q.    Who is that, please?
18       A.    Abida, A-b-i-d-a.
19       Q.    And is she a Pennsylvania resident?
20       A.    No, she's here.
21       Q.    In Florida?
22       A.    In Boca.
23       Q.    And how long to your knowledge has BNK
24   Real Estate been in business?
25       A.    A year maybe, since 2009.

Page 83

1        Q.    And do you have any interest in that
2    company?
3        A.    No, I don't have any interest.
4        Q.    Do you have any involvement for the
5    management of that company?
6        A.    Yeah. I am managing that company,
7    yes.
8        Q.    What type of management do you provide
9    for BNK?
10       A.    I do all operating management. I do
11   all the management, A to Z, for the company.
12           MR. NEWBURGH: Can we take five
13   minutes, please?
14           MR. LITTLE: Give me a couple of
15   minutes.
16   BY MR. LITTLE:
17       Q.    In which company do you conduct those
18   management services for for BNK?
19       A.    Which company?
20       Q.    In which of your companies?
21       A.    MAQ Management.
22       Q.    And have you provided those management
23   services for BNK since its inception?
24       A.    Since the company opened, yes.
25       Q.    Did you have involvement with

Page 84

1    assisting your sister in opening that company?
2        A.    I don't recall. But they opened with
3    attorneys, you know. I helped them, every single
4    thing to start. Starting, setting accounts, yes.
5        Q.    Okay. Does BNK Real Estate have
6    property it owns unrelated to the Evergreen Elder
7    Care?
8        A.    They have another property for them.
9    Evergreen is only the mortgage transfer. There's
10   no real estate.
11       Q.    Well, that was a poorly phrased
12   question. Does BNK have other business other than
13   holding the mortgage?
14       A.    Yes.
15       Q.    Okay. What was paid to GMAQ for the
16   transfer of this mortgage?
17       A.    Didn't pay anything. The thing is our
18   family money was involved and we give them this
19   mortgage, 2 point 3.
20            And I put 1 point 250, the family, I
21   raise the money to give the first mortgage. We
22   don't have the money, this is the money that was
23   supposed to be collected and invested, 50 percent,
24   and George invest 50 percent on this. 50 percent.
25   I borrowed the family money and invest. And we are

21 (Pages 81 to 84)

Page 89

1  lose this money, to sign over to
2  Mr. Doukas, to Mr. A and Z or himself and run away
3  with my money. So I have interest on this. So I
4  protect my interest and transfer that up to BNK.
5      Q.    The foreclosure action that you
6  referred to, sir, was that filed in the name of
7  GMAQ?
8      A.    Yes.
9      Q.    And as I understand it then, you have
10 transferred the mortgage set forth on Plaintiff's
11 Exhibit 49 as part of an effort to protect the
12 interest your family had in GMAQ?
13        MR. NEWBURGH: Object to form.
14 BY THE WITNESS:
15     A.    Family money, I said, not family
16 investment. They invest on me, so we protect the
17 interest so George don't do crazy things like he
18 has been doing, transferring his company, right and
19 left, without concern for his partners. So that's
20 why I took the steps in March, when I find out. I
21 did that transfer, yes.
22 BY MR. LITTLE:
23     Q.    And then BNK did not pay any
24 additional compensation to GMAQ for this
25 assignment, did it?

Page 90

1      A.    No.
2      Q.    Okay. And does BNK today continue to
3  receive revenue from Evergreen?
4        MR. NEWBURGH: Object to form.
5  BY THE WITNESS:
6      A.    No, I haven't received for several
7  months. They are behind. They receive only few
8  payments, three or four, until basically they had
9  some financial issues, economy issues, they are not
10 paying it. And right now they are behind for three
11 months.
12 BY MR. LITTLE:
13     Q.    Do you know what the value of that
14 property is that is serving for the security of
15 that mortgage?
16     A.    In this kind of market, maybe less
17 than two million dollars right now.
18        MR. LITTLE: Let's take a break.
19 Counsel asked for it.
20        MR. NEWBURGH: I appreciate it.
21        (WHEREUPON, a recess was had.)
22        (Time Noted: 11:35 - 11:55 a.m.)
23 BY MR. LITTLE:
24     Q.    We have talked about a couple of
25 different transfers in the last two exhibits that

Page 91

1  we have examined, sir, Exhibits 47 and 49.
2        Have there been any other transfers of
3  properties from Flovest since December of 2009 to
4  your knowledge?
5      A.    To the best of my knowledge, only two
6  transactions have happened. I don't recall
7  anything else we have done.
8      Q.    Any other real property transfers from
9  GMAQ or BMAQ since December of 2009?
10     A.    To the best of my knowledge, I don't
11 remember. I don't think so. I don't think we did
12 anything. Only thing we are paying bills.
13     Q.    Are you familiar with a company by the
14 name of Blair International?
15     A.    Yes, I saw it on the paper. Ted
16 Doukas owns that company.
17     Q.    What is your understanding of that
18 company?
19     A.    Just one of his companies. That's
20 all. I was never involved with anything with Blair
21 International. That's Ted Doukas's, that's his
22 company.
23     Q.    I forgot to ask you earlier, since
24 December of 2009, other than the three companies
25 that you are involved in, do you have any other

Page 92

1  business dealings with Mr. Doukas?
2      A.    No. The only thing we had at one
3  time, when we was -- when he came in and we wanted
4  to supply gasoline. Like my original business is
5  in gas stations and convenience stores. And he
6  was -- we had it, one of them, Ft. Meyers, a gas
7  station, a bunch of them, they wanted to supply
8  gasoline there. When you supply gasoline, you get
9  the new account with a major company like BP,
10 Amoco, Shell or Mobil, you will open a wholesale
11 account.
12        So Ted was telling me he had a
13 terminal. He owned one of the terminals, which was
14 a gasoline storage terminal. Which is very rare,
15 not too many people can own that thing, all the
16 pipelines connected to supply gasoline. So it was
17 interesting to me because that's my primary
18 business is gas station, convenience store.
19        So I flew with him up to Mississippi
20 and I saw the terminal. They have a storage
21 terminal, I think 4 point 5 million gallons, the
22 storage terminal. He said he was able to supply
23 gasoline through the terminal up to -- below the
24 rack price.
25        See, how the rack price is, gas you

Verbatim Court Reporters, Inc.
866-551-4700 / www.realtimecourtreporters.com