1          UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
2

3                 Judge Erik P. Kimball

4

5

In Re:
6
                         Case No. 11-29148-BKC-EPK
7

8    MAHAMMAD A. QURESHI,

9          Debtor.

10   _____

11

12            ORAL RULING RE: DE 287, DE 324

13

14

15                 November 14, 2013

16

17

18   The above entitled cause came on for hearing before
     the HONORABLE ERIK P. KIMBALL, one of the Judges in
19   the UNITED STATES BANKRUPTCY COURT, in and for the
     SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler
20   Drive, West Palm Beach, Palm Beach County, Florida, on
     November 14, 2013, commencing on or about 2:30 p.m.,
21   and the following proceedings were had:

22

23

24

              Transcribed from an audio recording by:
25         Jacquelyn Ann Jones, Court Reporter

Page 2

1    APPEARANCES:

2

     RICE PUGATCH ROBINSON & SCHILLER
3    By: CRAIG PUGATCH, ESQUIRE
     On behalf of TM Debt Acquisition

4

5    MARSHALL SOCARRAS GRANT, P.L.
     By: JOEY M. GRANT, ESQUIRE
6        LARRY PECAN, ESQUIRE
     On behalf of Mahammad Qureshi

7

8    TELEPHONIC APPEARANCES:

9

     SALAZAR JACKSON, LLP
10   By: AARON HONAKER, ESQUIRE
     On behalf of First Southern Bank

11

12   FOLEY & LARDNER, LLP
     By: KEVIN RECK, ESQUIRE
13   On behalf of BB&T

14

     Also Present:

15

     Mahammad Qureshi

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The last matter on the calendar
2    is Mahammad Qureshi.  Do I have several parties on the
3    phone?  I believe Mr. Honaker.
4          MR. HONAKER:  Good afternoon, Your Honor.
5    Aaron Honaker on behalf of First Southern Bank.
6          THE COURT:  Mr. Reck.
7          MR. RECK:  Good afternoon, Your Honor.
8    Kevin Reck on behalf of BB&T.
9          THE COURT:  And Mr. Willinger.  Is Scott
10   Willinger on the phone?
11         OPERATOR:  No, Your Honor, he is not.
12         THE COURT:  And here in the courtroom.
13         MR. GRANT:  Good afternoon, Your Honor.  Joe
14   Grant and Larry Pecan on behalf of the debtor Mahammad
15   Qureshi.  Mahammad Qureshi is also present.
16         THE COURT:  Gentlemen, good afternoon.
17         MR. PUGATCH:  Craig Pugatch of Rice,
18   Pugatch, Robinson, Schiller, for the objecting party,
19   TM Debt Acquisition.
20         THE COURT:  Very good.  Is there anything I
21   need to know from the parties before I rule on
22   confirmation?  Yes.
23         MR. GRANT:  Nothing is changed since the
24   last hearing, Your Honor.
25         THE COURT:  Mr. Pugatch?

1          MR. PUGATCH:  No.

2          THE COURT:  No.  All right.  I apologize to

3   all of you.  As you can tell, I have a cold, and I

4   have quite a lot of notes in order to rule.  So it

5   might take me a little bit longer than usual.

6          This is the Court's ruling on confirmation

7   of the plan of reorganization that was presented by

8   the debtor in this case.

9          Mr. Qureshi's plan has four classes of

10  claims and interests.  The first class is described as

11  priority tax claims, which is technically not a class

12  under Section 1123(a)(1), so for purposes of

13  confirmation there are really only three classes.

14         Class 2 is the secured claim of MB Financial

15  Services, which provides for reamortization of its

16  debt over a period of time at a new interest rate.

17  That's an impaired class and it is an accepting

18  class.

19         Class 3 is unsecured creditors.  That class

20  will be paid $5,000 a month over a five year period,

21  pro-rata, plus an additional 24,000 at the end of year

22  five for a total, under the original plan, of

23  $324,000.  That class is impaired.  It did not accept.

24         And of course Class 4 is equity, which is

25  the debtor's interest in his own property, and that

1    class is unimpaired.

2              I had an initial confirmation hearing on

3    July 11th, 2013, and at that time I had two objections

4    from First Southern Bank and from TM Debt Acquisition,

5    who is present here today.

6              The First Southern Bank objection was

7    resolved at that time.  The objection of TM Debt

8    Acquisition at the time, the debtor attempted to

9    resolve that by amending his plan to provide for

10   potential payment resulting from whatever recovery he

11   might have from an entity in which he holds a 50

12   percent equity interest.  That's GMAQ.  I'm going to

13   address that at more length in a moment.

14             Back on the July 11th hearing that amendment

15   was not acceptable to TM Debt Acquisition, and so the

16   Court scheduled a second day for the confirmation

17   hearing to address the objections that TM Debt

18   Acquisition had raised.

19             Between the two hearings the debtor filed a

20   formal amendment to his plan at docket entry 333.

21   Among the things that are contained in that amendment

22   is the following language.  I'm going to quote it,

23   because it is important in the context of the

24   ruling.

25             "Upon the resolution of the various lawsuits

1    involving GMAQ, LLC, if the debtor realizes any

2    monetary value from his alleged ownership interest in

3    GMAQ, LLC, such value shall be distributed to the

4    Class 3 creditors in pari passu.

5              If, however, there is no resolution of the

6    litigation within four years after the effective date,

7    the debtor shall auction off his interest in GMAQ,

8    LLC, with no representations or warranties, to the

9    highest bidder, and any moneys derived from such an

10   auction will be distributed to Class 3 creditors in

11   pari passu".

12             At the July 11th hearing, again, going back

13   to the first confirmation hearing, TM Debt said that

14   its only remaining objections would be, good faith,

15   best interest of creditors, and 1129(a)(15).

16             At the continued hearing that I held on

17   October 22nd, TM Debt also stated objections based on

18   feasibility and fair and equitable treatment.  The

19   debtor didn't object to those objections being raised

20   at the second hearing, and I will consider them, but

21   in the end, they don't have any impact on the Court's

22   ruling.

23             On October 22nd TM Debt -- the creditor, TM

24   Debt Acquisition addressed the following objections.

25   I'm going to walk through the Code provisions and the

1  nature of these objections just generally.

2        First, under 1129(a)(3) a plan must be

3  proposed in good faith and not by any means forbidden

4  by law.  These are the provisions the pointed to as

5  the bases for objection.

6        Under 1129(a)(7), the best interest of

7  creditor test, requires that each holder to claim must

8  have either accepted the plan, or will receive under

9  the plan what it would be entitled to in a

10 hypothetical Chapter 7 case of the debtor.  This

11 provision applies to the unsecured creditor's class

12 here because it has not accepted the plan.

13       Under 1129(a)(11), the feasibility test, the

14 confirmation of the plan must not be likely to be

15 followed by the liquidation or the need for further

16 financial reorganization of the debtor.

17       1129(a)(15), a relatively new provision that

18 applies only to individuals in Chapter 11, if the

19 debtor is an individual, and any holder of an allowed

20 unsecured claim objects, and of course we have such an

21 objection here, the value of the property distributed

22 under the plan must be at least equal to the debtor's

23 projected, disposable income to be received in the

24 five years after confirmation.

25       And lastly, under 1129(b)(1), which is one

1    of the cram down provisions, among other things, the

2    plan must be fair and equitable with respect to each

3    class of impaired claims and interest, and 1129(b)(2)

4    provides a non-exclusive list of treatment that is

5    deemed to be fair and equitable for unsecured

6    creditors, which is what's at issue here, that

7    includes the absolute priority rule.  Meaning they are

8    to be paid in full or holders of claims junior, or

9    interest junior, are to receive nothing.

10           In its written objection, which was filed

11   prior to the July hearing, TM Debt Acquisition raised

12   the absolute priority rule as an objection to

13   confirmation.  Although I've previously ruled that

14   amendments to the Bankruptcy Code in 2005, including

15   the addition of Section 1115, mean that the absolute

16   priority rule does not apply to individual debtors,

17   this is still a hotly contest issue, and we have no

18   answer in the 11th Circuit.

19           At the confirmation hearing TM Debt

20   Acquisition abandoned this objection, however, as a

21   result of the 11th Circuit's decision, In Re Lett,

22   it's necessary for the Court to address the absolute

23   priority rule even in the absence of an objection.

24           I followed the reasoning of the 9th Circuit

25   Bankruptcy Appellate panel in its decision, In Re

1    Friedman, F-r-i-e-d-m-a-n.  You can find that at 466

2    Bankruptcy Reporter, 471.  It's a 2012 decision ruling

3    that the absolute priority rule does not apply to

4    individuals in Chapter 11.  It's a very well reasoned

5    decision.

6                I note that even if it did, an individual

7    Chapter 11 debtor could always retain his or her

8    exempt assets as the debtor does not retain exempt

9    assets on account of an interest junior to that of

10   unsecured creditors.

11               By definition a debtor's right in exempt

12   assets is senior to the rights of unsecured creditors.

13   I'm mentioning this only because there is preBAP CPA

14   case law in this District that would lead one to the

15   conclusion that an individual debtor would be required

16   to devote his or her exempt assets to overcome the

17   absolute priority rule.  That makes no sense in light

18   of the language of the statute as it has existed even

19   before BAP CPA.

20               Let's get to the crux of some of the issues

21   in this case.

22               Mr. Qureshi owns a 50 percent equity

23   interest in GMAQ, a Florida limited liability company.

24   There's ongoing litigation in an Ohio Bankruptcy Court

25   in the bankruptcy of George Bavelis regarding the

1 ownership of the other 50 percent interest in GMAQ.

2          Mr. Bavelis testified in this confirmation

3 hearing.  He and another person both claim ownership

4 of the other half of GMAQ.

5          There is also ongoing litigation with regard

6 to certain transfers made by GMAQ prior to the filing

7 of this and Mr. Bavelis' case.  But there is no

8 dispute that Mr. Qureshi owns half of GMAQ.

9          The parties spent some time on the issue of

10 whether GMAQ has an operating agreement.  The reason

11 for this dispute is that the operating agreement

12 claimed to be that of GMAQ, which was admitted as

13 Exhibit 1 in the confirmation hearing, would have

14 prohibited Mr. Qureshi from causing GMAQ to enter into

15 certain transactions without getting approval of the

16 other 50 percent owner of GMAQ.

17          But this issue is a red herring, because if

18 Mr. Qureshi is correct that GMAQ has no operating

19 agreement, the same would be true under Florida

20 Statutes Section 608.422.  Majority approval would be

21 required for certain transactions, and because there

22 are two 50 percent owners, the effect would be to

23 require unanimous consent.

24          Either way, Mr. Qureshi could not have

25 legally caused GMAQ to undertake any non-ordinary

1    course transaction without the approval of the owner,

2    of the other owner.

3           Mr. Qureshi claims that his 50 percent

4    interest in GMAQ has no value, and so he gave it no

5    value in his liquidation analysis required under

6    Section 1129(a)(7).

7           TM Debt argues that GMAQ has significant

8    value, and that Mr. Qureshi's one half interest thus

9    also has significant value, that he has not included

10   in the liquidation analysis in this case.

11          TM Debt argues that Mr. Qureshi's plan does

12   not satisfy the best interest of the creditors test as

13   the unsecured creditors would recover more in a

14   Chapter 7 case, including the value of his interest in

15   GMAQ, than they will under the plan that is presented

16   for confirmation here.

17          Mr. Qureshi attempted to answer this

18   objection by amending his plan to provide that any

19   value he receives from his ownership of GMAQ will be

20   paid to his unsecured creditors, and that if he

21   receives no value within four years, he will auction

22   his interest in GMAQ and provide the proceeds to his

23   unsecured creditors.

24          TM Debt argues that this amendment is

25   ephemeral because it includes no requirement that Mr.

1   Qureshi attempt to cause GMAQ to realize on its assets

2   or pursue what TM Debt argues are fairly obvious

3   claims.

4          Indeed, TM Debt argues that it is in Mr.

5   Qureshi's best interest for GMAQ not to pursue

6   liquidation of its assets and claims, as if it fails

7   to do so, members of Mr. Qureshi's family will benefit

8   at the expense of Mr. Qureshi's creditors.

9          The evidence offered by TM Debt on this

10  issue is compelling.  GMAQ has significant value,

11  certainly greater -- certainly greatly more than the

12  null value assigned by Mr. Qureshi.  Mr. Qureshi

13  himself has received, admittedly in the past,

14  significant offers for his interest in GMAQ.

15         More importantly, the evidence shows that

16  GMAQ has assets presently that it can and should

17  pursue.

18         GMAQ is the successful bidder at a

19  foreclosure sale on the so-called O'Brien lots.  There

20  was competitive bidding, and GMAQ was required to bid

21  $490,300 to obtain the property.  This was before

22  payment of taxes of about $120,000.

23         Based on these facts, it is reasonable for

24  the Court to deduce that the O'Brien lots have a value

25  of at least $610,000.  There's an escrow account held

1   by the Ohio Bankruptcy Court.  Its balance is at least

2   $54,000, and perhaps as high as $154,000, depending on

3   whether certain tax liabilities were paid from the

4   account before or after the statement admitted as part

5   of Exhibit 5.

6          Mr. Bavelis' testimony that the $154,000

7   balance was after payment of such tax liabilities was

8   credible.  But even if the tax liabilities were paid

9   from that sum, this would leave $54,000 or so in the

10  account, and the remainder would have gone to the

11  benefit of another asset of GMAQ.

12         Mr. Qureshi caused GMAQ to transfer a

13  valuable mortgage loan to BNK, an entity controlled by

14  Mr. Qureshi but owned by members of his family.

15         The borrower on the loan is an entity known

16  as Evergreen Elder Care.  BNK paid nothing for the

17  Evergreen loan, other than to pay the legal bills in

18  connection with a foreclosure action after it acquired

19  the loan.

20         Not only has Evergreen made generous offers

21  of settlement in the millions of dollars, but it

22  appears undisputed that the collateral for the

23  mortgage loan has significant value, about 3 million

24  dollars.  Mr. Qureshi himself has indicated in writing

25  that Evergreen is worth 2.4 million.

1        Mr. Qureshi testified that the Evergreen

2   mortgage loan was transferred to BNK as GMAQ could not

3   afford to pursue the claim.  Yet BNK, another entity

4   controlled by Mr. Qureshi, but outside the grasp of

5   his creditors, somehow has been able to pursue the

6   claim.

7        It appears very likely that BNK will realize

8   a significant recovery on the Evergreen loan, an asset

9   that should have been pursued for the benefit of

10  GMAQ.

11       GMAQ, as an entity, has a fairly obvious

12  claim in connection with the Evergreen transaction, a

13  transaction accomplished in violation of the law

14  governing the operation of GMAQ.  Whether that be

15  subject to the operating agreement admitted at Exhibit

16  1, or pursuant to Florida Statute.

17       There's no doubt that GMAQ's claim has

18  significant value.  There's also no doubt that BNK now

19  holds the Evergreen mortgage loan primarily because

20  Mr. Qureshi did not want it to be in GMAQ.  He did not

21  want it to be in GMAQ because it might then be subject

22  to attack by his creditors.

23       Lastly, GMAQ was in the business of making

24  loans.  Mr. Bavelis, who again, testified credibly

25  throughout his testimony, stated that a number of the

1    loans owned by GMAQ were likely collectible.

2             Indeed, Mr. Bavelis attributed the

3    collectability of certain of the loans owned by GMAQ

4    to statements made by Mr. Qureshi himself.  These

5    statements were not rebutted.

6             Mr. Qureshi testified that GMAQ has

7    significant liabilities.  His testimony on this point

8    made little sense.  First, Mr. Qureshi pointed to the

9    litigation over the ownership of the other 50 percent

10   of GMAQ, claiming that GMAQ had incurred significant

11   legal fees in that litigation.  But there's no reason

12   for the entity itself to incur legal fees in a dispute

13   between two of its owners.  Such fees are their own to

14   pay.

15            Mr. Bavelis, who is responsible for

16   maintaining the corporate records for GMAQ, for most,

17   if not all of its existence, testified credibly that

18   GMAQ did not have material debts for legal bills.

19            Mr. Qureshi also claimed that there were

20   lender liability claims by Evergreen against GMAQ, but

21   the debtor provided no detail as to the amount or

22   potential success of such claims.  There is no

23   evidence that would allow the Court to quantify such

24   liabilities.

25            Mr. Qureshi testified that Mr. Bavelis has a

1   a significant claim against GMAQ.  Even if this is the

2   case, the amount of that claim pales in comparison to

3   the assets held by GMAQ.

4          The evidence fairly overwhelmes that Mr.

5   Qureshi's interest in GMAQ has value far and above

6   that assigned by Mr. Qureshi in his liquidation

7   analysis.  It's not necessary for the Court to

8   determine an exact value for GMAQ, or Mr. Qureshi's

9   interest in that entity.

10          It's enough to find, as the Court must in

11   the face of the evidence, that the value of Mr.

12   Qureshi's interest in GMAQ will greatly augment the

13   $324,000 in the aggregate offered to unsecured

14   creditors under his plan.  Indeed, his interest in

15   GMAQ is probably a significant multiple of that dollar

16   amount.

17          The question then is whether Mr. Qureshi's

18   amendment to his plan is sufficient to answer this

19   objection.  The Court concludes that it does not.

20          Mr. Qureshi does not offer to pursue the

21   value of his interest in GMAQ.  He does not pledge to

22   take any particular action to cause GMAQ to realize on

23   its assets and claims.  In fact, he does not pledge to

24   do anything at all.

25          Mr. Qureshi's amendment states only that if,

1   and the emphasis is on the word if, if he receives

2   anything as a result of his interest in GMAQ, he will

3   pay that to his unsecured creditors.  And if he

4   receives nothing during the next four years, then he

5   will auction his interest in GMAQ and pay the proceeds

6   to his unsecured creditors.

7            At first glance this sounds like an answer

8   to the objection.  But given the evidence in this

9   case, the amendment does nothing at all.  Mr. Qureshi

10  has no incentive to pursue the value of his interest

11  in GMAQ, particularly as he would not seek any

12  personal benefit from it.

13           If Mr. Qureshi does nothing, it is possible

14  that the most valuable asset, the claim GMAQ has in

15  connection with the Evergreen loan, will be realized

16  on by BNK for the primary benefit of Mr. Qureshi's

17  family members.  And a number of GMAQ's loans were

18  made to members of Mr. Qureshi's friends and family.

19  He has no incentive to collect from them either.

20           In fact, the four year waiting period seems

21  designed specifically to allow for BNK to realize the

22  value in the Evergreen loan, to the detriment of GMAQ,

23  and for other assets to waste away, so that when Mr.

24  Qureshi's interest in GMAQ is finally auctioned, it

25  will have no value at all.

1          The debtor makes technical arguments that

2     GMAQ cannot pursue avoidance actions under Section 500

3     of the Bankruptcy Code as it is not a debtor, and

4     arguments that the debtor himself is not a creditor of

5     GMAQ so he cannot himself pursue certain claims.

6          Yet the Court can imagine a number of

7     potential claims Mr. Qureshi can pursue as a 50

8     percent owner of GMAQ to cause GMAQ to realize the

9     value of the Evergreen loan.

10         Similarly, Mr. Qureshi could cause GMAQ to

11    collect from his friends and family members the funds

12    they borrowed from GMAQ, and could realize on the

13    O'Brien lots.

14         No matter who the other owner of GMAQ is,

15    there is little doubt that party will want GMAQ to

16    obtain the best recovery on its assets that it can.

17         Mr. Qureshi does not intend to realize the

18    value of GMAQ, because it will not benefit him.  But

19    GMAQ has significant value, and so Mr. Qureshi's

20    interest in it has significant value that he has not

21    taken into account in this case.

22         Mr. Qureshi has not met his burden in

23    proving that his plan meets the best interest of

24    creditors test contained in Section 1129(a)(7).  In

25    fact, the evidence is replete in showing that he could

1   not meet the best interest test with the present plan.

2         Mr. Qureshi's amendment does not assist him

3   in this regard because it promises nothing.  It adds

4   no actual value to the mix.  Confirmation of the plan

5   is to be denied on this basis alone.

6         For substantially the same reasons, the

7   Court finds that the plan, as amended, is not proposed

8   in good faith.  The evidence shows that Mr. Qureshi

9   caused GMAQ, and likely other entities, to enter into

10  transactions designed to leave Mr. Qureshi's creditors

11  with access to a smaller universe of assets from which

12  to recover.

13         In particular, the transfer of the Evergreen

14  loan to BNK, an entity for the benefit of Mr.

15  Qureshi's family members, for no consideration,

16  exhibits a lack of good faith.

17         The debtor's transactions involving Flovest

18  are similarly suspicious.  And then he brought that

19  smaller universe of assets into this case offering a

20  relative pittance to his unsecured creditors.

21         Mr. Qureshi has not met his burden in

22  proving that his plan is proposed in good faith as

23  required by Section 1129(a)(3).  Based on the evidence

24  submitted here, the Court finds that the evidence

25  proves exactly the opposite, that this bankruptcy was

1    filed, and the present plan, as amended, presented in

2    a focused attempt to deny creditors access to value

3    they otherwise would have had in partial satisfaction

4    of their claims.  This is a second, independent basis

5    to deny confirmation of the plan as amended.

6              TM Debt argues that since the present plan

7    does not include assets that should be included, so as

8    to avoid violating the best interest of creditors

9    test, and it does not, that the plan fails the

10   feasibility test of Section 1129(a)(11).

11             This objection perhaps goes one step too

12   far.  The focus of Section 1129(a)(11) is the plan

13   presently before the Court for confirmation, not a

14   plan that would allow -- plan that would allow the

15   debtor to avoid a problem under another provision of

16   Section 1129.

17             If a plan is confirmable for other reasons

18   under Section 1129, but is not feasible, it should not

19   be confirmed.  If another plan would satisfy

20   requirements other than the feasibility test, but

21   itself would not be feasible, does not make the plan

22   as filed infeasible.  The Court does not believe the

23   feasibility objection applies in this case.

24             TM Debt abandoned its objection under

25   Section 1129(a)(15) on the second day of the

1  confirmation hearing, stating that the debtor's

2  amendment to the plan satisfied this objection.

3  Consequently, there is no objecting holder of an

4  allowed unsecured claim, and Section 1129(a)(15) does

5  not apply in this case.

6          But if there was an objection outstanding

7  under this provision, the debtor's amendment to his

8  plan does not, in fact, answer it.  In order to

9  satisfy Section 1129(a)(15) the debtor must show that

10 he has devoted his projected disposable income to

11 payment of creditors under his plan.

12         Projected disposable income is the debtor's

13 disposable income projected over the relevant period.

14 Here it's five years.  In determining what disposable

15 income is to be projected, the Court must consider

16 income that is regularly expected -- reasonably

17 expected.  Obviously, regular salary is typically

18 projected to continue.  Completely speculative income

19 is not included.  That a debtor's rich aunt might die

20 and leave a debtor a large sum of money is generally

21 not projected for this purpose.  Here the amendment

22 provides no promise of value.  Indeed, it seems

23 calculated to provide no value at all.

24         Yet, there's good reason to believe the

25 debtor will, in fact, obtain value from his interest

1  in GMAQ if it is diligently pursued.  That potential

2  income is projected to occur within the life of the

3  plan, as five years seems likely to encompass recovery

4  in all of the assets of GMAQ that were addressed in

5  evidence.

6          That one cannot ascertain exactly when each

7  recovery might occur is not fatal.  The debtor could

8  fashion an amendment that captured this value.

9          TM Debt's counsel suggested several

10  alternatives in his closing argument, but the

11  amendment does not include any of those approaches, it

12  promises nothing, and so it would not satisfy a

13  pending objection under 1129(a)(15), if there was one.

14  TM Debt also argues that the plan as amended is not

15  fair and equitable in its treatment of unsecured

16  creditors.

17          Section 1129(b)(2) provides a non-exhaustive

18  list of treatment that is fair and equitable.  For

19  unsecured creditors the primary protection is the

20  absolute priority rule.  TM Debt dropped its objection

21  based on the absolute priority rule, and the Court has

22  ruled that it does not apply in this case.

23          While it's possible to make an argument that

24  the plan is not fair and equitable to unsecured

25  creditors, because it does not offer them the real

1   value of the debtor's assets, this is an argument

2   already covered by the best interest of creditors

3   test.

4           The Court does not see an independent basis

5   for objecting under Section 1129(b)(1).  In any case

6   this objection is not necessary to defeat confirmation

7   in the present case.

8           For the foregoing reasons, confirmation of

9   the plan at ECF 287, as amended by ECF 333, is

10  denied.

11          Now my standard order setting confirmation

12  hearing says that if confirmation is denied, I will

13  consider conversion or dismissal of the case.  That

14  depends on what the parties want to ask of me at this

15  point.  Otherwise, the only thing that happens today

16  is confirmation is denied.

17          Anybody wish to be heard?

18          MR. PUGATCH:  Your Honor, at this point

19  we would reserve the right that supposedly we would

20  have in any event if the case proceeds as is, to move

21  for conversion or dismissal.  We have not been

22  instructed by the client to do that, and so we don't

23  don't make that request at this time.

24          THE COURT:  All right.  Then I'll simply

25  enter a brief order denying confirmation.

1          Now, I need to ask, what is the debtor going

2    to do?

3          MR. GRANT:  Amend the plan.  I mean, that's

4    the only option.  I mean, it's obviously dismissal is

5    a possibility.  Conversion is not.

6          So we have to evaluate those options,

7    discuss it, and as you said, counsel indicated at the

8    end of his presentation there were options and

9    alternatives that may be possible, so I think there

10   are ways in which we can discuss it with counsel to

11   make an amendment to the plan to their satisfaction of

12   how to deal with GMAQ as an asset for the benefit of

13   the creditors.  So it's either going to be one of

14   those two things, Your Honor.

15         THE COURT:  All right.  Thank you.  Yes.

16         And you should talk with counsel for TM

17   Debt.  I'm not going to set another deadline right

18   now, which I could do.  I think you should think about

19   where the debtor is headed in this case.

20         MR. GRANT:  Yes.

21         THE COURT:  You should know however, that if

22   there isn't a revised plan filed quickly, or some

23   other motion which brings this case to a, how should I

24   put it, a point where a decision needs to be made,

25   whether it's staying here, or being converted, or

1   what's happening, that I'll likely enter an order to

2   show cause why it shouldn't be dismissed.

3           MR. GRANT:  Do you have an idea, Your Honor,

4   in terms of what that time period would be?

5           THE COURT:  No.  Fast.

6           MR. GRANT:  Okay.  Thank you, Your Honor.

7           THE COURT:  Yes.  Fast.

8           MR. GRANT:  Understood.

9           THE COURT:  You know, I don't want to put

10  you artificial pressure right now.  We have a creditor

11  that is actively involved in the case.  I assume

12  you'll negotiate with them.

13          MR. GRANT:  We've been very active in our

14  discussions, Your Honor.  I'm sure we'll continue that

15  and get it resolved one way or the other very quickly.

16          THE COURT:  Thank you all very much.

17          MR. GRANT:  Thank you, Your Honor.

18          THE COURT:  Court is adjourned.

19          MR. PUGATCH:  Thank you, Your Honor.  Feel

20  better.

21          THE COURT:  Did you have a question?

22          MR. PUGATCH:  No.  Feel better, I said.

23          THE COURT:  Thank you.  It's just a cold.

24  It's only annoying when you have to talk a lot.

25          MR. PUGATCH:  Good thing your job doesn't

1    require that, right.

2              THE COURT:  Yeah.

3              MR. HONAKER:   Thank you, Your Honor.

4              THE COURT:  Good afternoon, everyone.

5              (The proceedings were concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, JACQUELYN ANN JONES, Court Reporter and

4    Notary Public in and for the State of Florida at

5    Large, do hereby certify that the foregoing

6    proceedings were transcribed by me from an audio

7    recording held on the date and from the place as

8    stated in the caption hereto on page 1, to the best of

9    my ability.

10

11         In witness whereof I have hereunto set my

12   hand and seal this  13th  day of  November, 2013.

13

14

15                            _____

16                            JACQUELYN ANN JONES

17                            Commission DD 853019

18                            Expires Feb. 18, 2017

19

20

21

22

23

24

25